UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MONTCLAIR CONDOMINIUMS ASSOCIATION, INC., ) ) ) Plaintiff, ) ) ) v. ) ) COMMUNITY ASSOCIATION ) UNDERWRITERS OF AMERICA, INC., ) and QBE INSURANCE CORPORATION, ) ) Defendants. ) | No. 3:08-0718<br>Judge Echols |

## MEMORANDUM

This case concerns the interpretation of a condominium insurance policy and comes before the Court for a ruling on cross-motions for summary judgment. Plaintiff Montclair Condominiums Association, Inc. ("Montclair") filed Plaintiff's Motion For Summary Judgment (Docket Entry No. 13), to which Defendants Community Association Underwriters of America, Inc. ("CAU") and QBE Insurance Corporation ("QBE") filed a response in opposition, as well as a Cross-Motion for Summary Judgment. (Docket Entry No. 14). The parties fully briefed these motions.

## I. FACTS

QBE, by and through its managing general agent, CAU, issued to Montclair an insurance policy, No. CAU201964-5, for the policy period August 21, 2006 through August 21, 2007. Under the policy, coverage was provided for three condominium buildings labeled A, B, and C located at 3818 West End Avenue, Nashville, Tennessee. These buildings contain forty-two residential units.

On or about June 22, 2007, Monclair reported to QBE and CAU that property damage had occurred in Unit 105 inhabited by James Broome, M.D., and his wife. According to Dr. Broome,

1

the unit was badly damaged as a result of wastewater intrusion. A powerful stench, as well as fungal growth and microbial contaminants, made the unit unfit and unsafe for human habitation since June 2007. The couple's personal belongings had to be removed and cleaned or discarded. The carpet and flooring had to be removed and destroyed and the entire unit cleaned. (Docket Entry No. 13-3, Broome Aff.)

The adjuster for QBE and CAU retained James E. Berkeley, a forensic engineer, to determine the cause of a pipe failure at Unit 105. (Docket Entry No. 18, Berkeley Aff.; 18-1, CV; 18-2, Berkeley Report; 18-3, photographs.) According to Mr. Berkeley's report, a fractured PVC pipe was removed from under the kitchen sink of the residence. The section of pipe is 4 inches in diameter with a 2-inch diameter T joint. The point of failure was at the junction of the 2-inch to 4-inch T section. The PVC pipe was installed when the condominiums were built in 1987. (Id.) Mr. Berkeley visited the unit, took numerous photographs, and contacted the plumber who repaired the pipe. Mr. Berkeley learned from the plumber that the hole in the stud was not aligned with the center line of the original T junction. As a result, the plumber had to notch the stud higher in order to allow alignment for the repair installation and not induce bending in the 2-inch pipe. (Id.) According to Mr. Berkeley, the original installation of the piping induced a bending stress in the PVC due to the misalignment of the hole. Over the period of 20 years, humidity and temperature caused the stud to expand and contract, which resulted in a fluctuating stress load on the pipe joint. The stress, in combination with the aging of the PVC which becomes brittle with age, caused the failure when the load exceeded the tensile strength of the material in the aged condition. (Id.) A crack in the PVC pipe originated at the top of the T junction, the weakest point in the T due to the parting line and the sharp corner which accentuates the stress encountered at that location. (Id.) In

2

his opinion, the crack likely started slowly, and worsened over a period of time as the water began to leak from the pipe. (Berkeley Aff. ¶ 6.) Mr. Berkeley ultimately concluded that the failure of the PVC pipe was caused by stress induced from a misalignment of the pipe through the stud and the T fitting, and the failure was due to improper installation when originally installed. (Id. at ¶ 7.)

In response, Montclair produced the Affidavit and curriculum vitae of R. Donald Robinson, who is currently Vice President of Construction for GBT Realty, Inc. in Brentwood, Tennessee. (Docket Entry No. 21, Robinson Aff.) He reviewed Mr. Berkeley's affidavit, report, and photographs. In Mr. Robinson's opinion, the fracture of the PVC plumbing fixture did not occur in a gradual manner, but would have been an abrupt collapse brought about when the load of the wall exceeded the tensile strength of the fixture. According to him, PVC fixtures are quite strong, yet brittle, and they fracture in an abrupt manner rather than bend, as would a steel support. (Id. ¶¶ 3-4.) Based on the photographic evidence, he opined that this fixture fractured when the horizontal drain line deflected to such a degree that there was no longer any fall on the drain line. In fact, the drain line fall inverted so that the line actually ran upwards from the kitchen sink and dishwasher it served. As a result, all wastewater from the sink and dishwater would have leaked into the wall and floor. (Id. ¶ 5.) Mr. Robinson also stated it was his understanding from the occupants of the unit that the kitchen sink and dishwasher were subjected to normal use for at least two years prior to June 2007. In his opinion, the fracture must have occurred shortly before it was first noticed, no more than two or three days. (Id. ¶ 6.)

In the reply brief, QBE and CAU point out that Montclair did not disclose Mr. Robinson in Plaintiff's Initial Disclosures or in accordance with the Initial Case Management Order's deadline for disclosing experts. They also point out Mr. Robinson did not examine the pipe in question or

3

visit Unit 105. They suggest that, given Montclair's repeated assurances that there are no genuine issues of material fact and Montclair's failure to disclose Mr. Robinson as required, the Court should give no weight to Mr. Robinson's opinion in the summary judgment analysis. Montclair did not respond to this argument.

Because it is undisputed that Montclair did not disclose Mr. Robinson in accordance with the Federal Rules and the deadlines set in the Initial Case Managment Order, the Court will not give any weight to Mr. Robinson's opinion. The Court also notes that QBE and CAU stated in their memorandum (Docket Entry No. 15 at 9) that the "presence of mold and the ongoing leaking of water into the basement/parking garage, for which extensive remediation was required" is proof that the crack in the PVC pipe allowed water to seep out over a long period of time. The Court will also not consider this statement because QBE and CAU have not produced any evidence to support the statement.

Montclair demanded coverage under the insurance policy, but QBE and CAU denied coverage and this lawsuit followed. The Court will examine below the pertinent policy language.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

4

## III. ANALYSIS

The central issue presented is the proper interpretation of the insurance policy. This question is a matter of law conducive to determination on cross-motions for summary judgment. See Colonial Pipeline Co. v. Nashville & Eastern R.R. Corp., 253 S.W.3d 616, 621 (Tenn. Ct. App. 2007). "In general, courts should construe insurance contracts in the same manner as any other contract." American Justice Ins. Reciprocal v. Hutchison, 15 S.W.3d 811, 814 (Tenn. 2000). The policy language must be understood in its plain, ordinary and popular sense. Id. If the language in an insurance policy is susceptible to more than one reasonable interpretation, it is ambiguous. Id. And if "the ambiguous language limits the coverage of the insurance policy, that language must be construed against the insurance company and in favor of the insured." Id.; Sturgill v. Life Ins. Co. of Georgia, 465 S.W.2d 742, 744 (Tenn. Ct. App. 1970).

> Under section I. PROPERTY DIRECT COVERAGES SECTION, the policy states:
>
> We will pay for direct physical loss of or damage to "covered property" caused by or resulting from any COVERED CAUSE OF LOSS under III.A. COVERED CAUSES OF LOSS.
>
> * * *
>
> Unless otherwise specified in this section, all EXCLUSIONS under III.B. EXCLUSIONS apply.
>
> Coverage is also provided for "covered property" which is not damaged but which must be removed and replaced in order to repair "covered property" which is damaged by a COVERED CAUSE OF LOSS under III.A. COVERED CAUSES OF LOSS.
>
> Under section XXVIII. DEFINITIONS SECTION, ¶ 18, "'Covered Property' (PROPERTY)

means property described in I. PROPERTY DIRECT COVERAGES SECTION for which a limit of insurance is shown in the 'Declarations.'" Under section I.A.1.a. "BUILDINGS," coverage is

5

provided for "[b]uildings that are described in the 'Declarations' and used in whole or in part as: residences[.]" The section further provides that "[b]uildings and structures include: pipes, wires, conduits . . . ."

Section III. of the policy is entitled, "PROPERTY CAUSES OF LOSS, EXCLUSIONS AND LIMITATIONS SECTION." Subsection A. COVERED CAUSES OF LOSS states: "Covered Causes of Loss includes IV. ADDITIONAL COVERED CAUSES OF LOSS SECTION and means immediate and direct physical loss or damage to 'covered property' unless the loss is excluded under III.B. EXCLUSIONS.

Subsection B. EXCLUSIONS provides:

1. Except as otherwise specified, we will not pay for loss or damage which would not have occurred in the absence of one or more of the following excluded events regardless of: (a) the cause of the excluded event; (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss:

\* \* \*

    f. WATER

\* \* \*

(3) Continuous or repeated seepage or leakage of water that occurs over a period of time.

(4) Overflow, leakage or seepage of water, other liquids, gases, powder or molten material from any source except fire protective systems, unless reasonable maintenance operations have been practiced.

(5) Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment, except fire protective systems, caused by or resulting from freezing, unless due diligence has been exercised to:

(a) Maintain heat in the building, structure and "unit"; or

> (b) Drain all the equipment and shut off the supply if the heat is not maintained.
>
> * * *
>
> However, with respect to (3), (4) and (5) above, if a COVERED CAUSE OF LOSS results, we will pay for any loss or damage it causes which would otherwise be covered.

Montclair contends that the policy covers the claimed loss in this case because covered property is specifically defined to include pipes, and overflow, leakage or seepage of water or other liquids is excluded under f.(4) "unless reasonable maintenance operations have been practiced." Montclair contends that QBE and CAU do not assert, nor could they assert, a lack of reasonable maintenance operations for a wholly enclosed drain pipe like this one was. Further, Montclair argues that f.(4) should be read to include plumbing because the immediately following provision, f.(5), specifically lists plumbing as an exclusion in the case of frozen pipes, but plumbing is not excluded in f.(4). Because the exclusion in f.(4) does not apply, Montclair argues that coverage exists for the claim. Alternatively, Montclair contends that f.(4) is ambiguous and must be construed against QBE and CAU.

QBE and CAU point to f.(3), which is a broader provision that excludes coverage for "[c]ontinuous or repeated seepage or leakage of water that occurs over a period of time." They contend that f.(3) bars coverage for this loss. In addition, they argue it is clear from the wording and punctuation of f.(4) that the phrase "unless reasonable maintenance operations have been practiced" modifies "fire protective systems" only. Therefore, the exclusion applies and no coverage exists.

The parties do not cite any cases in support of their respective interpretations of f.(4), and the Court has not been able to locate any cases construing this particular policy language. Following the guiding principle that policy language must be understood in its plain, ordinary and popular

7

sense, American Justice Ins. Reciprocal, 15 S.W.3d at 814, the Court agrees with Montclair that the last phrase in f.(4), "unless reasonable maintenance operations have been practiced," relates to the entire sentence, not just "fire protective systems." This is confirmed by the placement of a comma immediately prior to the word "unless."

Thus, f.(4) is reasonably interpreted to refer to "overflow, leakage or seepage" that originates "from any source except fire protective systems[.]" Such "overflow, leakage or seepage" may involve "water, other liquids, gases, powder or molten material." Coverage for any overflow, leakage or seepage from the named sources is excluded under the policy "unless reasonable maintenance operations have been practiced." If reasonable maintenance operations have been practiced, then this exclusion does not apply.

To read the clause as QBE and CAU do would produce an absurd result. If the last phrase relates only to "fire protective systems" despite the placement of the comma before the word "unless," then overflow, leakage or seepage from a fire protective system would be excluded only when reasonable maintenance operations *have been practiced*. Surely, this is not what the drafter meant.

QBE and CAU have made no evidentiary showing that Montclair failed to practice reasonable maintenance operations with regard to the PVC pipe and T joint at issue. Consequently, the exclusion found in f.(4) does not apply to exclude coverage here. But it does not immediately follow that coverage is available, because QBE and CAU point to other exclusions which bar coverage in this case.

The Court agrees with QBE and CAU that coverage is excluded under three other policy provisions. The policy excludes coverage for continuous or repeated seepage or leakage of water

8

that occurs over a period of time, III.B.1.f.(3); the policy excludes coverage for material factors, such as cracking, bulging, expanding, mold, rot and fungi, III.B.2.b.(4) & (5); and the policy excludes coverage for faulty, inadequate, defective, or negligent workmanship and construction, III.B.3.b.(2). Because the undisputed evidence shows that the PVC pipe cracked due to faulty, inadequate, defective, or negligent workmanship and construction and caused continuous or repeated seepage or leakage of water over a period of time, there is no coverage for this event under the condominium policy.

Montclair contends that coverage exists under the "collapse" provisions of the policy. Monclair argues that the "policy defines 'collapse' broadly to include a caving in <u>of any part</u> of a building or structure such that it cannot be occupied for its intended purpose." (Docket Entry No. 13-2, Memorandum at 2 (emphasis in original).) Stated another way in the same brief, Montclair argues that "defendants' insurance contract specifies coverage if 'any part' of a covered building falls down, caves in or flattens and it thereby results that the building cannot be occupied for its intended purposes." (<u>Id.</u> at 4.)

The Court does not agree with Montclair that the policy language can be so construed. The policy defines "Collapse" as "an abrupt falling down, caving in or flattening of a building, structure or of any part of a building or structure with the result that the building, structure or the collapsed part of either cannot be occupied for its intended purpose." There is no evidentiary showing that the PVC pipe under the kitchen sink abruptly fell down, caved in, or flattened. Further, the cracking of the PVC pipe does not fall within the specific provisions for "collapse" coverage found in section IV.A.1.a.-e., which include (a.) breakage of structural glass, (b.) decay that is hidden from view, (c.) insect or vermin damage that is hidden from view, (d.) weight of people or personal property,

9

or (e.) weight of rain that collects on a roof. The policy covers "collapse" after construction is completed only if the collapse is caused in part by a cause of loss listed in A.1.a.-e. Further, subsection b. states that a part of a building which is standing is not considered to be in a state of "collapse" even if it has separated from another part of the building. Subsection c. states that no building or any part of the building shall be considered to be in a state of "collapse" even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinking, or expanding.

Montclair relies on Rankin v. Generali-U.S. Branch, 986 S.W.237 (Tenn. Ct. App. 1999), to persuade the Court that "collapse" coverage exists in this situation, but Rankin is distinguishable. There, the "collapse" concerned a structural basement wall that rotated and twisted outward from the weight of heavy equipment parked next to the front of the building. The court recognized that, under the majority view, the term "collapse" does not require complete destruction or falling in of the building. Id. at 238. The court said the modern trend of the cases was to hold that collapse coverage provisions (which define collapse as not including cracking and settling) provide coverage if there is substantial impairment of the structural integrity of the building or any part of a building. Id. In Rankin, there was substantial impairment to the structural integrity of the building. Here, there was no substantial impairment to the structural integrity of Unit 105 or the building as a whole, and it would stretch Rankin too far beyond its facts to apply the case to a substantial impairment of the structural integrity of a PVC pipe. The Court concludes that the event at issue does not fall within "collapse" coverage as stated in section IV. of the policy.

## IV. CONCLUSION

For all of the reasons stated, Plaintiff's Motion For Summary Judgment (Docket Entry No. 13) will be denied, and Defendants' Cross Motion For Summary Judgment (Docket Entry No. 14)

will be granted. The condominium policy does not provide coverage on the undisputed facts presented.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

11